USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___7/12/21___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANTHONY DAVIS,

                Petitioner,

   -against-

UNITED STATES OF AMERICA,

                Respondents.

18-CV-8219 (JMF) (BCM)

13-CR-484 (JMF)

**REPORT AND RECOMMENDATION
TO THE HON. JESSE M. FURMAN**

**BARBARA MOSES, United States Magistrate Judge.**

On August 29, 2018, petitioner Anthony Davis, proceeding pro se, filed a motion pursuant to 28 U.S.C. § 2255 to vacate, set aside or correct his 120-month sentence for conspiracy to commit bank fraud and possession of stolen mail matter. *See* Pet. (Dkt. No. 1 at ECF pages 1-14) at 1. The sentence was imposed on October 23, 2014, after Davis pled guilty to both crimes. *See* Judgment (13-CR-484 Dkt. No. 80) at 1-2.[1] On November 10, 2015, the judgment was affirmed on appeal. *United States v. Ojudun*, 630 F. App'x 25, 27 (2d Cir. 2015) (summary order).

Petitioner claims that he was denied his Sixth Amendment right to the effective assistance of counsel because his criminal defense attorney (1) failed to argue that he made no admission that the loss amount or intended loss amount approximated or exceeded $1 million, *see* Pet. Br. (Dkt. No. 1 at ECF pages 15-32) at 6-9; (2) failed to challenge the sentencing judge's "plain error" in applying an upward variance to his sentence for post-plea conduct neither charged nor admitted in the federal criminal case, *id.* at 9-14; and (3) failed to appeal on the basis of judicial bias in sentencing. *Id.* at 14-17.

Because the Petition was untimely filed, I recommend, respectfully, that it be dismissed.

---

[1] Citations to "Dkt. No. __" are to filings in No. 18-CV-8219. Citations to "13-CR-484 Dkt. No. __" are to filings in the underlying criminal case, No. 13-CR-484.

## I.    BACKGROUND

### A.    The Bank Fraud Scheme and Petitioner's Arrest[2]

In June 2011, the United States Postal Inspection Service (USPIS) began investigating a multi-year bank fraud scheme. Resp. Sent. Subm. at 1. The scheme involved account holders who, using their own identities, opened bank accounts at TD Bank branches in Manhattan and the Bronx. *Id.* The account holders then provided other individuals (the Scheme Participants) with their personal account numbers, personal identification numbers, and ATM cards, in exchange for money. *Id.* The Scheme Participants deposited counterfeit checks into the account holders' accounts and then, within a day or two, withdrew cash from the accounts at ATMs, or purchased money orders drawn on the accounts, for their own financial benefit. *Id.* at 1-2.

In or about March 2012, three Scheme Participants were charged in connection with the bank fraud scheme. Resp. Sent. Subm. at 2. Two of them (Anthony Gray and Bianca Dupree) were promptly arrested; the third (Oluwole Ojudun) fled.[3] *Id.* Agents later identified a fourth Scheme Participant (the Cooperating Witness), who was arrested in January 2013 and thereafter agreed to cooperate with the government's investigation. *Id.* at 2. The Cooperating Witness advised the government that he had been recruited by Ojudun to deposit counterfeit checks, and that another individual nicknamed "Sugar Hill" or "Sug" – later identified as petitioner Davis – was responsible for providing the counterfeit checks. *Id.* at 2. Between March 2012 and March 2013, after the other

---

[2] Because petitioner pleaded guilty, there was no trial. The facts in this section are taken from the government's October 20, 2014 sentencing submission (Resp. Sent. Subm.) (13-CR-484 Dkt. No. 78), which in turn was based on the May 20, 2014 Presentence Report prepared by the United States Probation Office. The Presentence Report was not publicly filed.

[3] Gray ultimately pled guilty to a one-count felony information charging him with bank fraud and was sentenced to time served and ordered to pay restitution in the amount of $230,000 to TD Bank. *See* Resp. Sent. Subm. at 2 n.2. Dupree was charged in a one-count indictment with bank fraud and was sentenced to time served and ordered to pay restitution in the amount of $45,000 to TD Bank. *See id.*

Scheme Participants had been charged, the Cooperating Witness began picking up counterfeit checks directly from petitioner. *Id.* at 2. The Cooperating Witness guessed that petitioner gave him approximately 100 counterfeit checks during that timeframe. *Id.*

USPIS calculated that the Scheme Participants together "were responsible for attempting to deposit approximately $1 million worth of counterfeit checks," all of which, according to the Cooperating Witness, had been supplied by petitioner. Resp. Sent. Subm. at 3. In total, "the scheme resulted in an actual loss to TD Bank of approximately $676,095." *Id.*

Petitioner, a Postal Service employee, was arrested at his apartment on May 9, 2013. Resp. Sent. Subm. at 3. From his apartment, federal agents seized, among other things: (1) a sheet of paper listing bank account information for a number of individuals, (2) "numerous checks made out to other individuals," (3) "debit and credit cards in the names of other individuals," (4) "check-printing software and paper," and (5) a revolver and ammunition. *Id.* Petitioner was initially charged by complaint and released on bail. *Id.*

**B.    Indictment and Guilty Plea**

On June 26, 2013, Davis and Ojudun (who was arrested on June 12, 2013) were indicted by a grand jury. The Indictment (13-CR-484 Dkt. No. 23) charged petitioner in three counts: (1) conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349; (2) bank fraud in violation of 18 U.S.C. §§ 1344 and 2; and (3) possession of stolen mail matter in violation of 18 U.S.C. § 1708.[4]

On December 10, 2013, petitioner entered into a plea agreement with the government, and on January 31, 2014, before the Honorable Katherine B. Forrest, United States District Judge, he pled guilty to Count One (bank fraud conspiracy) and Count Three (possession of stolen mail

---

[4] Ojudun ultimately pled guilty to one count of bank fraud conspiracy and was sentenced to a "Guidelines-term of 40 months' imprisonment, three years' supervised release, and ordered to pay forfeiture and restitution to TD Bank in the amount of $676,095.00." Resp. Sent. Subm. at 3.

3

matter). *See* Transcript dated January 31, 2014 (Plea Hr'g Tr.) (13-CR-484 Dkt. No. 39) at 26:24-27:3. The plea agreement described a stipulated guidelines range of 41 to 51 months' imprisonment, based on a stipulated guidelines offense level of 22. *Id.* at 18:6-13, 21:2-7. Petitioner understood that those calculations were not binding on the Court. *Id.* at 18:14-19:10.

### C.     Bail Revocation Hearing

On June 11, 2014, the government filed a letter-motion (June 11, 2014 Ltr.) (13-CR-484 Dkt. No. 48) requesting that the Court issue a warrant for petitioner's arrest and conduct a bail revocation hearing. June 11, 2014 Ltr. at 1. Mr. Davis had been arrested that morning by state law enforcement officers and was to be charged later that day with two felonies: criminal possession of a forged instrument in the second degree, and falsifying business records in the first degree. *Id.* at 1-2. The complaint alleged that on or about February 22, 2014 (three weeks after his plea hearing before Judge Forrest), petitioner "deposited a counterfeit United States Postal Money Order in the amount of $960 into a bank account held in [petitioner's] name at an HSBC Bank branch in the Bronx, New York." *Id.* at 2. The government argued that petitioner's arrest and state charges furnished "probable cause to believe that the [petitioner] has violated the terms of his bail by committing State crimes during the period of release." *Id.* at 2.

On June 25, 2014, during a bail revocation hearing before Judge Forrest, petitioner consented to detention. *See* Transcript dated June 25, 2014 (Bail Rev. Hr'g Tr.) (13-CR-484 Dkt. No. 61) at 3:3-6. During the same hearing, the parties asked that sentencing be postponed so that they could further investigate the state charges and determine the necessity of a *Fatico* hearing. Bail Rev. Hr'g Tr. at 3:6-15, 9:1-12, 11:14-12:25.[5] By Order dated June 26, 2014 (13-CR-484 Dkt.

---

[5] "A '*Fatico*' hearing is a sentencing hearing at which the prosecution and the defense may introduce evidence relating to the appropriate sentence." *United States v. Lohan*, 945 F.2d 1214,

No. 51), Judge Forrest revoked petitioner's bail, adjourned his sentencing to September 18, 2014 (later adjourned again, to October 23, 2014), and tentatively scheduled a *Fatico* hearing for the same date should petitioner formally request it.

### D.        Pre-Sentencing Submissions

On September 10, 2014, petitioner's counsel, George Goltzer, Esq., submitted a letter to Judge Forrest as a "preliminary submission" in order to "summarize factors mitigating punishment without . . . minimiz[ing] the severity of the offense to which Mr. Davis entered his plea." (13-CR-484 Dkt. No. 74.) The letter laid out the factors provided in 18 U.S.C. § 3553(a) which courts consider when imposing a sentence, and presented petitioner's case for lessening his punishment, including that he was a "non-violent first offender, intelligent and possessed [] a long work history." (*Id.* at 2.) Thereafter, on October 20, 2014, Mr. Goltzer filed another letter withdrawing petitioner's application for a *Fatico* hearing, and enclosing character letters from his family for consideration at sentencing. (13-CR-484 Dkt. No. 77.)

Also on October 20, 2014, the government submitted its sentencing submission, requesting that Judge Forrest "impose a sentence within the applicable United States Sentencing Guidelines . . . range." Resp. Sent. Subm. at 1. Specifically, the government explained that the Probation Office calculated the base offense level at 7, then added 14 levels because the "loss amount is more than $400,000, but not more than $1,000,000." *Id.* at 5. Further, "[b]ecause the offense involved ten or more victims, the offense level is increased by two levels," and "because the defendant abused a position of public trust in that he stole mail that was entrusted to him as an employee of the United States Postal Service, . . . the offense level is increased two levels," making 25 the "adjusted offense

---

1216 (2d Cir. 1991) (citing *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979)) (internal quotation marks omitted).

level." *Id.* The government further noted that, in the plea agreement, it had "anticipated that [petitioner] would be entitled to a three-level reduction in the offense level based on acceptance of responsibility," bringing the offense level down to 22. *Id.* However, because petitioner "continued to engage in bank fraud following his guilty plea," the government argued, he had "failed to demonstrate acceptance of responsibility" and "should be denied the three-level reduction for acceptance of responsibility" previously contemplated. *Id.*[6] "Based on an offense level of 25 and a Criminal History Category of I," the government concluded, "the applicable Guidelines range is 57 to 71 months' imprisonment." *Id.* The government also requested that Judge Forrest issue Orders of Forfeiture and Restitution in the amount of $676,095. *Id.* at 8.

On October 23, 2014, attorney Goltzer submitted several additional letters from family and friends attesting to petitioner's character. (13-CR-484 Dkt. No. 79.)

### E.    Sentencing

At petitioner's sentencing hearing, on October 23, 2014, Judge Forrest explained that she had reviewed each of the pre-sentencing submissions outlined above, as well as the Presentence Report and a letter from the government (not publicly filed on the docket) attaching a "victim impact statement from TD Bank" indicating that it was "seeking restitution in the amount of $1,717,036." *See* Transcript dated October 23, 2014 (Sent. Hr'g Tr.) (13-CR-484 Dkt. No. 116-1) at 3-4. Asked whether his client "contests that the loss to TD Bank was in that amount," attorney Goltzer stated, "We are not in a position to contest the loss to TD Bank in that amount, although I

---

[6] The plea agreement anticipated this possibility, stating: "Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, *see* U.S.S.G. [U.S. Sentencing Guidelines Manual] § 3E1.1, regardless of any stipulation set forth above, if the defendant fails clearly to demonstrate acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence." *See* Resp. Sent. Subm. at 5 n.8.

will tell you that the defendant didn't profit by anything remotely approaching anything like that astronomical sum." *Id.* at 4:13-20.

Assistant United States Attorney Daniel Scott Noble clarified that the figure provided by TD Bank was "the loss that they calculated for this type of counterfeit check fraud scheme overall," as it was unable "to pinpoint this $1.7 million loss figure on the scheme that is being prosecuted" against petitioner. Sent. Hr'g Tr. at 6:14-19. With respect to the conspiracy count, however, the prosecutor stated that the government "believes that it can prove based on the bank records . . . that the intended loss amount attributable to Mr. Davis . . . is approximately a million dollars." *Id.* at 6:23-7:3. The following exchange then occurred:

| | |
|---|---|
| THE COURT: | It is one million even. Is that correct? |
| MR. NOBLE: | Yes, it is approximately one million is what we believe we can prove based on the analysis that the postal inspector did. |
| THE COURT: | And the postal inspector's analysis was done with respect to TD Bank. Is that right? |
| MR. NOBLE: | That's correct. |
| THE COURT: | Let's go on to HSBC. So the conduct that occurred in June of 2014 – actually, February of 2014, was not part of that analysis. Is that correct? |
| MR. NOBLE: | That is true, your Honor. |
| THE COURT: | And that was in the amount of $960. Is that right? |
| MR. NOBLE: | That is the attempted loss amount, yes. |

Sent. Hr'g Tr. at 7:7-20.

Judge Forrest thereupon asked defense counsel if he contested the fact that the loss figure, as calculated by the postal inspector, was "in the amount of $1 million even," Sent. Hr'g Tr. at 8:2-6, which did not include "the HSBC amount." Attorney Goltzer replied:

I do not contest the accuracy of the postal inspector's calculation nor that it related solely to TD Bank. I do contest any finding that might be made that it was a million

> dollars even. The government has suggested that it was approximately a million dollars.
>
> If it is the Court's intention to go $960 over the million dollars and thereby elevate the guideline[s] by a couple of points, I respectfully object to that. I don't think there is sufficient [information] before the Court on this particular record, and it is our position that [the] guideline[s] calculation for purposes [of the] amount should remain where the government had put it in the plea agreement, which is no more than a million dollars.

*Id.* at 8:7-19. Counsel further argued that petitioner's post-plea conduct (including depositing or attempting to deposit two counterfeit checks in the amounts of $960 and $3,500, respectively) was *not* part of the "relevant conduct in this particular conspiracy." *Id.* at 9:7-13.

Judge Forrest disagreed, stating that petitioner's post-plea conduct "appeared in all ways to be part of the same scheme and course of conduct," and that regardless of when it occurred, it was "the same manner and method of proceeding." Sent. Hr'g Tr. at 9:14-20. Consequently, she found that "those loss amounts or attempted loss amounts," *i.e.*, the $960 and the $3,500, "are appropriately included" in the calculation of the proper offense level, and concluded that petitioner was responsible for "an amount that exceeds a million dollars but falls below the $2.5 million threshold that would bump him into yet another category." *Id.* at 9:14-10:7.

Judge Forrest then performed a guidelines calculation, beginning with the base offense level of 7, pursuant to U.S.S.G. § 2B1.1(a)(1), *see* Sent. Hr'g Tr. at 14:17-18, to which she added another 16 levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(I), after finding that the "reasonably calculated" estimated loss amount exceeded one million dollars. *Id.* at 14:17-23.[7] Consistent with the plea agreement, Judge Forrest then added two levels for the crime involving ten or more victims, and two more levels for abuse of public trust. *Id.* at 14:24-15:5. Finally, finding "by a

---

[7] The Sentencing Guidelines have since been amended, such that a 16-level increase only occurs where the estimated loss amount exceeds $1,500,000. *See* U.S.S.G. § 2B1.1(b)(1)(I).

preponderance of the evidence that there has been no adequate acceptance of responsibility," she declined to make the "three-point downward adjustment" contemplated in the plea agreement. *Id.* at 15:20-23. Given the total offense level of 27, as calculated by the Court, the applicable guidelines range was 70 to 87 months' imprisonment. *Id.* at 15:24-25; 16:7-8.

After Judge Forrest completed her calculation, petitioner's counsel once again objected to the "inclusion of more than a million dollars as a loss amount," Sent. Hr'g Tr. at 16:24-25, and asked that the Court find the appropriate offense level to be 25 points rather than 27 points. *Id.* at 17:9-14. He further argued that a finding of over a million dollars under the circumstances would be "an abuse of discretion and a clearly erroneous fact-finding." *Id.* at 18:2-7; *see also id.* at 19:2-7 ("we think you're getting the guidelines wrong"). Judge Forrest again disagreed, repeating that it was "reasonable based upon a preponderance of the evidence that the loss amount is greater than a million dollars." *Id.* at 19:19-21.[8]

Judge Forrest then moved to an assessment of the § 3553(a) factors. Sent. Hr'g Tr. at 24. Describing petitioner's crime as "outrageous," "blatant," and "brazen," she observed that petitioner seemed to think he was "going to essentially be a bank robber in some way that was not violent." *Id.* at 35:13-15, 36:8-9. She then noted that petitioner's crime took place "repeatedly" and "over the course of a couple of years." *Id.* at 36:10-13. Most "egregiously," "it occurred after [he was] arrested and after [he had] pled guilty," *id.* at 36:14-15, which signified to Judge Forrest if the Court exercised leniency, he would simply "go and do it again because it's a way of earning money." *Id.* at 39:23-40:1. Further, Judge Forrest explained, it was "very important" to her

---

[8] At this point, AUSA Noble stepped in to clarify that "approximately a million dollars" was an estimate "erring on the side of caution." Sent. Hr'g Tr. at 21:16-24. According to the government, the estimate was based on what it could "prove beyond a reasonable doubt at a criminal trial" rather than by a "preponderance of the evidence," which is all that is required at the sentencing stage. *Id.* at 22:1-5.

sentencing analysis that petitioner had been in a position of trust (as a Postal Service worker) while engaging in the criminal scheme, *id.* at 40:2-8, and that the scheme victimized not only the banks but also many postal customers who "didn't get their mail," including "checks that they really may have needed, checks that they were really relying upon to pay their rent, to pay their electricity, to pay their bills, to buy shoes for their children. They didn't get that." *Id.* at 40:12-18.

Judge Forrest ultimately found that a sentence of 120 months (ten years) of imprisonment was "the appropriate but not greater than necessary sentence." Sent. Hr'g Tr. at 41:12-14. Recognizing that 120 months represented "an upward variance from the guidelines which the Court has calculated," she explained that "the guidelines don't take into consideration certain factors which are particularly relevant," including "the number of times it was done" and "the fact that after" other Scheme Participants had been arrested, petitioner "continued to do the same thing" for a year. *Id.* at 41:17-25. Judge Forrest also imposed a five-year term of supervised release following petitioner's release from prison, as well as restitution and forfeiture in the amount agreed to in the plea agreement. *Id.* at 45:1-6, 43:22-44:7.

### F.    Petitioner's Direct Appeal

On direct appeal to the Second Circuit, petitioner (still represented by Mr. Goltzer) argued (1) that "the district court's intended loss calculation was 'speculative[],'" and (2) that "the district court abused its discretion by imposing an above-Guidelines sentence." *Ojudun*, 630 F. App'x at 26.

By summary order dated November 10, 2015, the Second Circuit affirmed the district court's sentence and judgment. With respect to the loss calculation, the Second Circuit rejected petitioner's argument because he failed to offer "any evidence that the intended loss was *less than* one million dollars," and "decline[d] to conclude that the district court failed to 'make a reasonable

estimate of the loss.'" *Ojudun*, 630 F. App'x at 26 (quoting U.S.S.G. § 2B1.1, cmt. n.3(c)). As to the 33-month upward variance, the Second Circuit again rejected petitioner's argument, explaining that on the record before it (including that petitioner continued his scheme "after his cohorts were indicted and even *after he was arrested* for his participation and had pled guilty"), there were "'sufficiently compelling' reasons to support the deviation." *Id.* at 27 (emphasis in original). Likewise, in addressing petitioner's argument that the "upward variance imposed by the district court resulted in his receiving an unjustifiably disparate sentence when compared to his codefendant Oluwole Ojudun," the court explained that Ojudun's case was distinguishable because, unlike petitioner, Ojudun was "not charged with or convicted of possession of stolen mail," did not "abuse a position of public trust," and did not "continue the scheme post-plea." *Id.*

Petitioner did not seek rehearing en banc. Nor did he petition the Supreme Court for a writ of certiorari. His time to do so expired 90 days after the date of the Second Circuit's summary order, *see* Sup. Ct. R. 13, making the judgment of conviction final as of February 8, 2016.

### G.    The § 2255 Petition

Petitioner first sought relief from this Court two and a half years later, on August 29, 2018. In his brief, filed along with his Petition, he acknowledges that he failed to file within one year of his judgment becoming final, as required by 28 U.S.C. § 2255(f)(1), but argues that his Petition is nonetheless timely because he filed it within one year of the Supreme Court's decisions in *Class v. United States*, 138 S. Ct. 798 (2018) and *Rosales-Mireles v. United States*, 138 S. Ct. 1897 (2018), each of which – he asserts – announced a "right newly recognized" that applies retroactively to his case. Pet. Br. at 1-2. Turning to the substance of his claims, petitioner argues first that his counsel was ineffective for failing to object and argue at sentencing that he made no "explicit admission of guilt" on his plea agreement that the loss amount or intended loss amount exceeded $1 million.

11

*Id.* at 6-9.[9] Second, he asserts that the district court erred in applying an upward variance for conduct that was neither charged nor admitted to in his federal case, and that his counsel was ineffective for failing to "challenge the error," which was "plain as it calls into question the competency and or integrity of the district court judge." *Id.* at 9-14.[10] Finally, petitioner contends that his counsel failed to argue, at sentencing or on appeal, "the apparent bias" of the district judge. *Id.* at 14-15.[11]

On November 20, 2018, the government filed its opposition brief (Def. Mem.) (13-CR-484 Dkt. No. 116), along with the sentencing hearing transcript. In its brief, the government principally argues that the Petition is untimely because neither Supreme Court case cited by petitioner recognized any new rights, and regardless, they are inapposite to the claims made here. Def. Mem. at 12. If the Court were to reach the merits, the government adds, the Petition should be denied because, among other things: most of petitioner's arguments were raised to and decided by the Second Circuit on direct appeal and are therefore barred by the mandate rule; petitioner's counsel actually made several of the objections petitioner claims he did not make; and other objections, if made, would have been meritless. Def. Mem. at 15-19.

---

[9] Petitioner also argues that his counsel was ineffective "for failing to challenge this error on appeal." Pet. Br. at 13.

[10] Petitioner also argues that counsel failed to "object and argue" at sentencing that the upward variance "breach[ed] the plea agreement." Pet. Br. at 11-12.

[11] Petitioner asserts that there "exists some evidence of potential bias on the part of the court" against defendants who are African-American (like petitioner), Pet. Br. at 14, but does not describe that evidence. He then asserts that "the size of the variance" in his case "exceeded the Nations [sic] norm in sentencing defendant's [sic] similarly situated to the petitioner," *id*. at 14-15, but does not cite any source data, nor explain what criteria he used to determine "similarly situated" defendants. Plaintiff further contends (again, without citing any source data) that "only 2% of defendant's [sic] similarly situated to the petitioner received an upward variance, and that variance was predicated upon intended loss amount calculation." *Id.* at 15. Therefore, petitioner concludes, his counsel should have done more research into apparent sentencing "irregularities in the sentencing practices of the court," which "would have aided counsel in proper presentation of petitioner's claim." *Id.*

Although petitioner moved for an extension to file a reply brief (13-CR-484 Dkt. No. 117) and was given until March 15, 2019 to do so (13-CR-484 Dkt. No. 118), he did not file any reply papers. According to the website of the United States Bureau of Prisons, petitioner is currently incarcerated at FCI Fort Dix, with an expected release date of February 15, 2023. https://www.bop.gov/mobile/find_inmate/index.jsp#inmate_results (last visited July 12, 2021).

## II.   THE PETITION IS UNTIMELY

### A.   Legal Standard

Claims brought pursuant to 28 U.S.C. § 2255 ordinarily must be brought within one year of "the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(f)(1). "[A] judgment of conviction becomes final when the time expires for filing a petition for certiorari contesting the appellate court's affirmation of the conviction." *Clay v. United States*, 537 U.S. 522, 525 (2003). If a petitioner fails to make his § 2255 motion within one year of that date, the petition will be untimely, and must be dismissed, unless one of the limited exceptions applies, including the exception relied on by petitioner: if the right asserted in the § 2255 motion "has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review," then the one-year limitations period runs from "the date on which the right asserted was initially recognized by the Supreme Court." 28 U.S.C. § 2255(f)(3).

### B.   Application

As noted above, petitioner had 90 days from November 10, 2015, which was the date of the Second Circuit's summary order, to file a petition for a writ of certiorari in the United States Supreme Court. *See Negron v. United States*, 394 F. App'x 788, 794 n.5 (2d Cir. 2010) ("Supreme Court Rule 13 requires that a petition for a writ of certiorari be filed within 90 days after the entry of judgment by a court of appeals."). He did not file such a petition. Therefore, his conviction

became final on February 8, 2016, *see Clay*, 537 U.S. at 525, giving him one year from that date (until February 8, 2017) to file his Petition in this Court. He missed that deadline by approximately 18 months. Moreover, the exception set forth in § 2255(f)(3) – allowing a petitioner to seek collateral relief up until one year after the date on which "the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review," *id.* – does not save his Petition.

Courts have applied the newly-recognized-rights exception, in accordance with its language, to provide an avenue for post-conviction relief where "the right asserted" by the petitioner was first recognized after the date on which the one-year limitations period would otherwise have commenced. Thus, for example, juvenile offenders given mandatory life sentences without possibility of parole have used § 2255(f)(3) to seek collateral review after the Supreme Court issued *Miller v. Alabama*, 567 U.S. 460 (2012), which prohibited mandatory life sentences without possibility of parole for juveniles. *See, e.g.*, *In re Williams*, 759 F.3d 66, 71 (D.C. Cir. 2014) (holding that Williams, who was sentenced to life without parole after being convicted of participating in a conspiracy that began when he was a juvenile and ended when he was an adult, made a "prima facie showing" that his successive § 2255 motion, filed within one year after the decision in *Miller*, was timely); *Bowens v. Cook*, 2020 WL 4043048, at *3 (D. Conn. July 17, 2020) (explaining in dicta that under a comparable provision applicable to individuals convicted in state court, 28 U.S.C. § 2244(d)(1)(C), the limitations period for Bowens' claim that his life sentence was unconstitutional because he was seventeen at the time of the offense began to run on the date of the *Miller* decision). Likewise, offenders sentenced under the Armed Career Criminal Act (ACCA) have been able, in some cases, to pursue collateral relief after the Supreme Court held in *Johnson v. United States*, 576 U.S. 591 (2015), that ACCA's residual clause, which imposed

14

a 15-year mandatory minimum on defendants convicted of being a felon in possession of a weapon who were found to have three "serious drug offense" or "violent felony" convictions, was unconstitutionally vague. *See*, *e.g.*, *Dail v. Mortun*, 2018 WL 3973014, at *3-4 (E.D.N.Y. Aug. 20, 2018); *Gilbert v. United States*, 2016 WL 3443898, at *6 (W.D. Wash. June 23, 2016).[12]

Here, petitioner relies on two 2018 Supreme Court decisions, *Class v. United States* and *Rosales-Mireles v. United States*, describing them as cases in which a right, retroactively applicable to his case, was newly recognized by the Supreme Court. Pet. Br. at 1-2. However, neither case first recognized any of the rights asserted by Mr. Davis in this Court. Consequently, the exception does not apply.

A federal grand jury indicted Rodney Class for possessing firearms in a car parked on the grounds of the United States Capitol in violation of 40 U.S.C. § 5104(e)(1), which provides that an individual "may not carry . . . on the Grounds or in any of the Capitol Buildings a firearm." *Class*, 138 S. Ct. at 802. After Class initially objected that the statute violated the Second Amendment, he pleaded guilty. *Id.* A few days after his plea hearing, Class appealed his conviction to the District of Columbia Circuit, in which he raised the same argument (that the statute violated the Second Amendment) and added that the statute violated the Due Process Clause of the United States Constitution. The Court of Appeals held that Class "could not raise his constitutional claims because, by pleading guilty, he had waived them." *Id.* at 802-03. The question before the Supreme Court was whether a guilty plea bars a criminal defendant from later appealing his conviction on the ground that the statute of conviction violates the Constitution, which the Court answered in the negative. *Id.* at 801-03.

---

[12] The Supreme Court later held that *Johnson* retroactively applied to cases on collateral review. *Welch v. United States*, 136 S. Ct. 1257, 1268 (2016).

*Class* "did not announce a new constitutional right." *Mitchell v. United States*, 2018 WL 10076678, at \*2 (S.D.N.Y. May 22, 2018) (Furman, J.). Even if it did, the holding of that case is nonetheless entirely irrelevant to the Petition now before the Court, because petitioner has never challenged the constitutionality of either of his statutes of conviction (conspiracy to commit bank fraud, 18 U.S.C. § 1349, and possession of stolen mail matter, 18 U.S.C. § 1708) and does not now argue that they are unconstitutional in any aspect. Rather, his Petition challenges the district judge's application of the United States Sentencing Guidelines. Therefore, *Class* does not help petitioner, *see Mitchell*, 2018 WL 10076678, at \*2 (holding that even if *Class* announced a new right, "that new right would not benefit Movant because *Class*'s holding concerns a defendant's right to challenge the constitutionality of his statute of conviction, a challenge not raised here"), and the one-year limitations period did not begin anew for him on the date *Class* was decided.

Florencio Rosales-Mireles pled guilty to illegal reentry. *Rosales-Mireles*, 138 S. Ct. at 1905. In the presentence investigation report, the Probation Office mistakenly double-counted a 2009 state conviction of misdemeanor assault, resulting in a guidelines range of 77 to 96 months, rather than the appropriate range of 70 to 87 months had Rosales-Mireles' criminal history been calculated correctly. *Id.* Rosales-Mireles did not object to the error before the district court, which relied on the guidelines range provided in the presentence investigation report in sentencing him to 78 months of imprisonment. *Id.* On appeal, the Fifth Circuit considered the factors established by the Supreme Court in *United States v. Olano*, 507 U.S. 725 (1993), in deciding whether to exercise discretion to correct an error: (1) "there must be an error that has not been intentionally relinquished or abandoned"; (2) "the error must be plain – that is to say, clear or obvious"; and (3) "the error must have affected the defendant's substantial rights." *Id.* at 1904-05. "Once those three conditions have been met, 'the court of appeals should exercise its discretion to correct the forfeited

16

error if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *Rosales-Mireles*, 138 S. Ct. at 1905 (quoting *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016)). The Fifth Circuit explained that it is the last *Olano* consideration, often referred to as "*Olano*'s fourth prong," that it was asked "to clarify and apply in this case." *Id.* Ultimately, the court declined to vacate and remand the case for resentencing because "the types of errors that warrant reversal are ones that would shock the conscience of the common man, serve as a powerful indictment against our system of justice, or seriously call into question the competence or integrity of the district judge." *Id.*

The Supreme Court reversed, holding that the Fifth Circuit's articulation of the applicable standard was "unduly restrictive" and "too narrowly confines the extent of a court of appeals' discretion." *Rosales-Mireles*, 138 S. Ct. at 1906. Rather, "[i]n the ordinary case, . . . the failure to correct a plain Guidelines error that affects a defendant's substantial rights" will satisfy *Olano*'s fourth prong. *Id.* at 1911. The Court concluded that the "Fifth Circuit abused its discretion in applying an unduly burdensome articulation of *Olano*'s fourth prong and declining to remand Rosales-Mireles' case for resentencing," and accordingly, remanded the case for further proceedings. *Id*.

As has been repeatedly recognized by the lower federal courts, *Rosales-Mireles* "did not identify a new right and make it retroactively available." *United States v. Carrasco*, 378 F. Supp. 3d 315, 317 (S.D.N.Y. 2019); *see also*, *e.g.*, *Carr v. United States*, 2020 WL 6145038, at \*3 (S.D.W. Va. Sept. 3, 2020) (collecting cases), *report and recommendation adopted*, 2020 WL 6142256 (S.D.W. Va. Oct. 19, 2020), *appeal dismissed*, 2021 WL 2550415 (4th Cir. Jan. 4, 2021). Rather, *Rosales-Morales* clarified the standard an appellate court must use in deciding whether to exercise discretion in correcting a plain error, discrediting the Fifth Circuit's interpretation of

*Olano* as "unduly restrictive." Accordingly, the one-year limitations period applicable to petitioner Davis was not affected by *Rosales-Mireles*.

Even if *Rosales-Mireles* could be viewed as establishing a newly recognized right of retroactive application, the case would not assist petitioner, because on his direct appeal the Second Circuit expressly rejected his claim that the district judge committed any error (a necessary prerequisite to reaching "*Olano*'s fourth prong"). Noting that its task was to "review the district court's interpretation of the Guidelines *de novo,* and its findings of fact relevant to the Guidelines application for clear error," *Ojudun*, 630 F. App'x at 26 (quoting *United States v. Broxmeyer,* 699 F.3d 265, 281 (2d Cir. 2012)), the Court of Appeals "decline[d] to conclude that the district court failed to 'make a reasonable estimate of the loss,'" and consequently upheld Judge Forrest's guidelines calculation. *Id.* Because the Second Circuit had no reason to reach "*Olano*'s fourth prong" in petitioner's case, the clarification of the standard to be used on the fourth prong is irrelevant to any issue now before this Court. For this reason as well, the one-year limitations period did not begin anew for Mr. Davis on the date *Rosales-Mireles* was decided.

## III.   CONCLUSION

"'[I]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the [§ 2255] motion' without holding an evidentiary hearing." *Lasher v. United States*, 2018 WL 3979596, at *10 (S.D.N.Y. Aug. 20, 2018) (quoting *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009)); *accord Ocasio v. Lee*, 2017 WL 456468, at *4 (S.D.N.Y. Feb. 2, 2017) (Furman, J.) (since "it is clear from the fact of Ocasio's Petition (and attached papers) that he is time-barred from habeas relief . . . the Petition must be and is dismissed.") In this case, it is clear from the Petition itself that it was not filed within one year of the date on which petitioner's judgment of conviction became

final. It is equally clear that the exception set forth in § 2255(f)(3) does not apply to save any of his untimely claims.[13] I therefore recommend, respectfully, that the Petition be DISMISSED as untimely. There is no need to proceed to the merits of petitioner's claims. *See Ocasio*, 2017 WL 456468, at *4; *United States v. Hoover*, 2020 WL 473639, at *4 (D. Vt. Jan. 3, 2020) (collecting cases), *report and recommendation adopted*, 2020 WL 472919 (D. Vt. Jan. 29, 2020). Since Davis has not made a substantial showing of the denial of a constitutional right, I further recommend that no certificate of appealability issue. *See* 28 U.S.C. § 2253(c)(2).

The Clerk of Court is respectfully directed to mail a copy of this Report and Recommendation to petitioner Anthony Davis.

Dated: New York, New York
   July 12, 2021

**BARBARA MOSES**
**United States Magistrate Judge**

### NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS
### TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). *See also* Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. Jesse M. Furman at 40 Foley Square, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Furman. **Failure to file timely objections will result in a waiver of such objections and will preclude appellate review.** *See Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

---

[13] Petitioner does not make any argument, nor does the Court perceive any, that the other two exceptions to the one-year period of limitations apply. That is, there was no "impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States," 28 U.S.C. § 2255(f)(2), nor were there any relevant facts supporting his claims that were only later discovered through the exercise of due diligence, 28 U.S.C. § 2255(f)(4).